**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BEVERLY TOMPKINS, individually and on behalf of all others similarly situated, and<br><br>Plaintiff,<br>v.<br><br>GSPLATFORMCO INC., a Delaware corporation, d/b/a ANKA,<br><br>Defendant. | Case No.: 1:26-cv-01549<br><br>**CLASS ACTION COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Beverly Tompkins ("Plaintiff"), individually and on behalf of all others similarly situated, and on behalf of the general public, upon personal knowledge of facts pertaining to her and upon information and belief as to all other matters, and by and through undersigned counsel, hereby brings this Class Action Complaint against Defendant GSPlatformCo Inc., d/b/a ANKA ("Defendant" or "ANKA"), and alleges as follows:

## NATURE OF THE ACTION

1. This class action arises out of a data breach (the "Data Breach") affecting Defendant GSPlatformCo Inc., a Delaware corporation doing business as "ANKA" (anka.africa), a global e-commerce platform connecting African businesses with customers worldwide. The Data Breach compromised the personally identifiable information ("PII" or "Personal Information") of Plaintiff and approximately 537,877 individuals nationwide.

2. According to information reported to the Maine Attorney General's Office and breach notifications sent to affected individuals, Defendant discovered on or about November 22, 2025, that an unauthorized party had accessed a system containing user account data. The compromised data derived from a snapshot dating to approximately April 30, 2025, and included

basic profile details (such as names, contact information, and demographic data), account status, and basic transaction history.

3. Defendant did not report the breach to the Maine Attorney General until January 12, 2026, nearly two months after discovery, and did not begin notifying affected consumers until on or about January 16, 2026. Plaintiff received her breach notification email on or about February 16, 2026.

4. Defendant's breach notice states that the incident involved an "external system breach" resulting in unauthorized access to user account data. While Defendant's notice states that login credentials, passwords, payment card details, authentication tokens, and financial information were not compromised, the exposed data—names, contact information, demographic data, account status, and transaction history—is precisely the type of information that enables targeted phishing, social engineering, and identity-related fraud.

5. Plaintiff brings this action to seek redress for the harms caused by the Data Breach, including the time and effort spent responding to the breach, the continuing and increased risk of targeted phishing and social engineering, the loss of privacy, the diminished value of Plaintiff's Personal Information, and the costs of mitigation, as well as injunctive relief requiring Defendant to implement and maintain reasonable data security practices consistent with industry standards.

6. Defendant owed a duty to Plaintiff and Class Members to implement and maintain reasonable and adequate security measures to protect their Personal Information from unauthorized access and disclosure. Defendant breached that duty. Despite clear and widely publicized guidance from the Federal Trade Commission ("FTC") and well-established industry standards regarding the protection of consumer data, Defendant failed to implement security practices sufficient to prevent an unauthorized third party from accessing a system containing the Personal Information

of over half a million individuals.

7. As a result of Defendant's failure to provide reasonable and adequate data security, Plaintiff and Class Members have been exposed to a heightened and ongoing risk of phishing, social engineering, spam, and identity-related fraud. Plaintiff has already experienced a marked increase in spam calls and spam emails following the Data Breach. This risk constitutes a concrete injury, and Plaintiff and Class Members now face the burden of ongoing vigilance and mitigation for the foreseeable future.

## THE PARTIES

8. Plaintiff Beverly Tompkins is a natural person and citizen and resident of Henrico, Virginia 23231. Plaintiff is or was a user or customer of Defendant's ANKA e-commerce platform whose Personal Information was maintained by Defendant in the system compromised in the Data Breach. On or about February 16, 2026, Plaintiff received an email notification from Defendant informing her that her information "could have been compromised" in the incident. Since becoming aware of the Data Breach, Plaintiff has experienced a substantial increase in spam calls and spam emails. Plaintiff has taken affirmative mitigation steps, including contacting her bank and spending time reviewing her accounts and monitoring for unauthorized activity. A true and correct copy of Plaintiff's breach notification email is attached hereto as **Exhibit A**.

9. Defendant GSPlatformCo Inc. (also styled "GSPlatform Co Inc.") is a for-profit corporation organized under the laws of the State of Delaware. Defendant operates a global e-commerce platform under the brand name "ANKA" (anka.africa), which connects African businesses with customers and consumers around the world. On information and belief, Defendant maintains its principal executive offices and/or conducts substantial corporate operations and decision-making in New York, New York, and transacts significant business in this District. On information and belief, Defendant's acquisition of ANKA and post-breach operations were

managed from New York.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.

11. This Court has personal jurisdiction over Defendant. On information and belief, Defendant maintains its principal executive offices and/or substantial corporate operations in New York, New York, and regularly transacts business in this District. Defendant's breach-response operations, including the coordination of notifications to affected individuals nationwide, were directed from and through New York. Defendant has sufficient minimum contacts with this District to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

12. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District, and Defendant has sufficient minimum contacts in this District.

## COMMON FACTUAL ALLEGATIONS

13. This is a class action brought by Plaintiff, individually and on behalf of all citizens who are similarly situated (i.e., the Class Members), seeking to redress Defendant's negligent violations of her privacy rights. Plaintiff and the other Class Members were customers who used Defendant's ANKA platform.

14. On or about April 30, 2025, an unauthorized third party accessed a system containing Plaintiff's and the Class Members' PII. Defendant discovered the unauthorized access on or about November 22, 2025.

15. This action pertains to Defendant's unauthorized disclosures of the Plaintiff's PII that occurred during the Data Breach.

16. Defendant disclosed Plaintiff's and the other Class Members' PII to unauthorized persons as a direct and/or proximate result of Defendant's failure to safeguard and protect their PII.

17. By obtaining, collecting, and storing the PII of Plaintiff and Class Members, Defendant assumed legal and equitable duties and knew or should have known it was responsible for protecting the PII from unauthorized disclosures.

18. Despite recognizing its duty to do so, Defendant failed to implement security safeguards to protect Plaintiff's and the Class Members' PII.

19. Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their PII and relied on Defendant to keep their PII confidential and maintained securely, to use this information for business purposes only, to make only authorized disclosures of this information, and to ensure that its third-party vendors take similar steps.

***1. The Data Breach***

20. According to Defendant's regulatory filing with the Maine Office of the Attorney General and breach notification (the "Breach Notice") to affected individuals, Defendant discovered on or about November 22, 2025 that an unauthorized third party had accessed a system containing user account data. The compromised data derived from a data snapshot dating to approximately April 30, 2025.

21. Defendant reported the Data Breach to the Maine Attorney General's Office on January 12, 2026, identifying approximately 537,877 individuals affected nationwide. The Maine Attorney General's report indicates that 102 Maine residents were among those affected.

22. Defendant's breach notification to consumers was listed as beginning on or about January 16, 2026 (electronic). Plaintiff received her notification email on or about February 16,

2026, approximately one month after the stated commencement of consumer notifications and nearly three months after Defendant's discovery of the breach.

23. On information and belief, based on the nature of the incident as described in Defendant's regulatory filings—an "external system breach" involving unauthorized access to a dataset containing hundreds of thousands of user records—Defendant failed to implement adequate security controls to protect the system at issue, including but not limited to adequate access controls, system configuration management, encryption at rest, intrusion detection, and activity monitoring.

24. On information and belief, the Data Breach was the direct result of Defendant's failure to implement and maintain reasonable and appropriate data security measures to protect the Personal Information it collected and stored from its users and customers

***2. The Data Breach was Preventable***

25. Had Defendant maintained industry-standard safeguards to monitor, assess, and update security controls and related system risks, Defendant could have safeguarded its users' and customers' data. Defendant's lack of security controls and the delayed implementation of enhanced security measures until only after the Data Breach are inexcusable.

26. Defendant was at all times fully aware of its obligation to protect customers' PII and the risks associated with failing to do so. Defendant knew that information of the type collected, maintained, and stored by Defendant is highly coveted and a frequent target of hackers.

27. This exposure, along with the fact that the compromised PII is already likely being sold on the dark web, is tremendously problematic. Cybercrime is rising at an alarming rate, as shown in the FBI's Internet Crime Complaint statistics chart shown below:




28. By 2013, it was being reported that nearly one out of four data breach notification recipients become a victim of identity fraud.[1]

29. Stolen PII is often trafficked on the dark web. Law enforcement has difficulty policing the dark web due to its encryption, which allows users and criminals to conceal identities and online activity.

30. When malicious actors infiltrate companies and copy and exfiltrate the PII that those companies store, that stolen information often ends up on the dark web because the malicious actors buy and sell that information for profit.[2]

31. In April 2023, NationsBenefits "disclosed that thousands of its members had their personal information compromised in a late-January ransomware attack targeting Fortra's GoAnywhere platform, a file-transfer software that the firm was using. According to the news reports, the ransomware gang CLOP claimed responsibility for the attack, saying it took advantage

---

[1] Al Pascual, *2013 Identity Fraud Report: Data Breaches Becoming a Treasure Trove for Fraudsters*, JAVELIN (Feb. 20, 2013), https://javelinstrategy.com/research/2013-identity-fraud-report-data-breaches-becoming-treasure-trove-fraudsters (last visited June 20, 2025).

[2] *Shining a Light on the Dark Web with Identity Monitoring*, IDENTITYFORCE (Feb. 1, 2020), https://www.identityforce.com/blog/shining-light-dark-web-identity-monitoring.

of a previously known vulnerability."[3]

32. In mid-April 2023, "the second largest health insurer [Point32Health], in Massachusetts, suffered major technical outages resulting from a ransomware attack. The incident brought down the company's systems that it uses to service members and providers, resulting in some members having difficulty contacting their insurers."[4]

33. In May 2023, MCNA Insurance Company disclosed that "personal health information of nearly nine million customers was compromised in a cyber incident discovered in March. In a data breach notification letter filed with the Maine state attorney general's office dated May 26, the firm said that it detected unauthorized access to its systems on March 6, with some found to be infected with malicious code…According to MCNA, the hackers were successful in accessing customer personal information."[5]

34. In April 2020, ZDNet reported in an article titled, "Ransomware mentioned in 1,000+ SEC filings over the past year", that "[r]ansomware gangs are now ferociously aggressive in their pursuit of big companies. They breach networks, use specialized tools to maximize damage, leak corporate information on dark web portals, and even tip journalists to generate negative news complaints as revenge against those who refuse to pay."[6]

35. In September 2020, the United States Cybersecurity and Infrastructure Security Agency published online a "Ransomware Guide" advising that "[m]alicious actors have adjusted their ransomware tactics over time to include pressuring victims for payment by threatening to

---

[3] Mark Rosanes, *The insurance industry cyber crime report: recent attacks on insurance businesses*, INSURANCE BUSINESS (June 12, 2023),https://www.insurancebusinessmag.com/us/guides/the-insurance-industry-cyber-crime-report-recent-attacks-on-insurance-businesses-448429.aspx.

[4] *Id.*

[5] *Id.*

[6] Catalin Cimpanu, *Ransomware mentioned in 1000 SEC filings over the past year*, ZDNET (April 30, 2020), https://www.zdnet.com/article/ransomware-mentioned-in-1000-sec-filings-over-the-past-year/.

release stolen data if they refuse to pay and publicly naming and shaming victims as secondary forms of extortion."[7]

36. Another example is when the U.S. Department of Justice announced its seizure of AlphaBay in 2017. AlphaBay had more than 350,000 listings, many of which concerned stolen and fraudulent documents that could be used to assume another person's identity. Other marketplaces, similar to the now-defunct AlphaBay, are awash with [PII] belonging to victims from countries all over the world. One of the key challenges of protecting PII online is its pervasiveness. "As data breaches in the news continue to show, PII about employees, customers, and the public is housed in all kinds of organizations, and the increasing digital transformation of today's businesses only broadens the number of potential sources for hackers to target."[8]

37. The PII of consumers remains of high value to criminals, as evidenced by the price they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[9] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[10] Criminals can also purchase access to entire company data breaches for $900 to $4,500.[11]

---

[7] Multi-State Information Sharing & Analysis Center, *Ransomware Guide*, UNITED STATES CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY (Sept. 2020), https://www.cisa.gov/sites/default/files/2023-01/CISA_MS-ISAC_Ransomware%20Guide_S508C.pdf.

[8] *Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web*, ARMOR (April 3, 2018), https://web.archive.org/web/20210614051146/https://www.armor.com/resources/blog/stolen-piiramifications-identity-theft-fraud-dark-web/.

[9] Anita George, *Your personal data is for sale on the dark web. Here's how much it costs,* DIGITAL TRENDS (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

[10] Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/?msockid=2bcba6b07db36c323b77b0a17cc26db2.

[11] *In the Dark*, VPNOVERVIEW, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Sept. 30, 2025).

38. Once PII is sold, it is often used to gain access to various areas of the victim's digital life, including bank accounts, social media, credit cards, and tax details. This can lead to additional PII being harvested from the victim, as well as PII from family, friends, and colleagues of the original victim.

39. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses in 2019, resulting in more than $3.5 billion in losses to individuals and business victims.

40. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

41. Data breaches facilitate identity theft as hackers obtain consumers' PII and thereafter use it to siphon money from current accounts, open new accounts in the names of their victims, or sell consumers' PII to others who do the same.

42. For example, the United States Government Accountability Office noted in a June 2007 report on data breaches (the "GAO Report") that criminals use PII to open financial accounts, receive government benefits, and make purchases and secure credit in a victim's name.[12] The GAO Report further notes that this type of identity fraud is the most harmful because it may take some time for a victim to become aware of the fraud, and can adversely impact the victim's credit rating in the meantime. The GAO Report also states that identity theft victims will face, "substantial costs and inconveniences repairing damage to their credit records… [and their] good name."[13]

43. The exposure of Plaintiff's and Class Members' PII to cybercriminals will continue

[12] *See* GOVERNMENT ACCOUNTABILITY OFFICE, *Personal Information: Data Breaches are Frequent, but Evidence of Resulting Identity Theft is Limited; However, the Full Extent is Unknown*, GAO-07-737 (June 2007), https://www.gao.gov/assets/gao-07-737.pdf.
[13] *Id.*

to cause substantial risk of future harm, including identity theft, that is continuing and imminent in light of the many different avenues of fraud and identity theft utilized by third-party cybercriminals to profit from this information.

***3. ANKA Failed to Comply with the Federal Trade Commission***

44. Federal and State governments have established security standards and issued recommendations to minimize data breaches and the resulting harm to individuals and financial institutions. The Federal Trade Commission ("FTC") has issued numerous guides for businesses that highlight the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[14]

45. In 2016, the FTC updated its publication, "*Protecting Personal Information: A Guide for Business,"* which established guidelines for fundamental data security principles for businesses.[15] Among other things, the guidelines note that businesses should properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[16]

46. Additionally, the FTC recommends that companies limit access to sensitive data, require complex passwords for network access, use industry-tested security methods, monitor the

---

[14] *See* FEDERAL TRADE COMMISSION, *Start With Security* (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.
[15] *See* FEDERAL TRADE COMMISSION, *Protecting Personal Information: A Guide for Business* (Oct. 2016) www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf
[16] *Id.*

network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.[17]

47. Highlighting the importance of protecting against phishing and other types of data breaches, the FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect PII, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

48. The delay between the date of the underlying data snapshot (April 30, 2025) and the date of Defendant's discovery of the breach (November 22, 2025)—a period of approximately seven months—further evidences Defendant's inadequate monitoring and intrusion-detection capabilities.

***4. The Impact of Data Breach on Victims***

49. Defendant's failure to keep Plaintiff's and Class Members' PII secure has severe ramifications. Given the nature and scope of the PII compromised in the Data Breach, including names, contact information, demographic data, account status, and transaction history, hackers can commit identity theft, financial fraud, and other identity-related fraud against Plaintiff and Class Members now and into the indefinite future. As a result, Plaintiff has suffered injury and faces an imminent and substantial risk of further injury, including identity theft and related cybercrimes, due to the Data Breach.

50. The PII exposed in the Data Breach is highly coveted and valuable on underground

[17] FEDERAL TRADE COMMISSION, *supra* note 14.

markets. Identity thieves and malicious actors can use the PII to: (a) conduct targeted phishing and social engineering attacks using victims' names, contact information, and transaction history to craft convincing fraudulent communications; (b) impersonate Defendant or known vendors in communications to victims; (c) use demographic and transaction data to gain victims' trust and extract additional sensitive information such as financial credentials; (d) aggregate the compromised data with other publicly or illicitly available data to build more complete profiles for identity-related fraud; and/or (e) sell or trade the compromised data on underground markets..

51. Furthermore, malicious actors often wait months or years to use the PII obtained in data breaches, as victims often become complacent and less diligent in monitoring their accounts after a significant period has passed. These bad actors will also reuse stolen PII, meaning individuals can be victims of several cybercrimes stemming from a single data breach.

52. Given the unauthorized access to customer PII maintained by ANKA, many victims of the Data Breach have likely already experienced significant harm as a result, including, but not limited to, identity theft and fraud. Plaintiff and Class Members have also spent time, money, and effort dealing with the fallout of the Data Breach, including reviewing financial statements, checking credit reports, contacting financial institutions, and spending time and effort monitoring for unauthorized activity.

53. It is no wonder, then, that identity theft exacts a severe emotional toll on its victims. The 2021 Identity Theft Resource Center survey evidences the emotional suffering experienced by victims of identity theft:

- 84% reported anxiety;
- 76% felt violated;
- 32% experienced financial-related identity problems;

- 83% reported being turned down for credit or loans;
- 32% reported problems with family members as a result of the breach;
- 10% reported feeling suicidal.[18]

54. Identity theft can also exact a physical toll on its victims. The same survey reported that respondents experienced physical symptoms stemming from their experience with identity theft:

- 48% reported sleep disturbances;
- 37.1% reported an inability to concentrate/lack of focus;
- 28.7% reported they were unable to go to work because of physical symptoms;
- 23.1 reported new physical illnesses (aches and pains, heart palpitations, sweating, stomach issues); and
- 12.6% reported a start or relapse into unhealthy or addictive behaviors.[19]

55. Annual monetary losses from identity theft are in the billions of dollars. According to a Presidential Report on identity theft produced in 2007:

> In addition to the losses that result when identity thieves fraudulently open accounts . . . individual victims often suffer indirect financial costs, including the costs incurred in both civil litigation initiated by creditors and in overcoming the many obstacles they face in obtaining or retaining credit. Victims of non-financial identity theft, for example, health-related or criminal record fraud, face other types of harm and frustration.
>
> In addition to out-of-pocket expenses that can reach thousands of dollars for the victims of new account identity theft, and the emotional toll identity theft can take, some victims have to spend what can be a considerable amount of time to repair the damage caused by the identity thieves. Victims of new account identity theft, for example, must correct fraudulent information in their credit reports and monitor their reports for future inaccuracies, close existing bank accounts and open new ones, and dispute charges with individual creditors.

---

[18] IDENTITY THEFT RESOURCE CENTER, *2021 Consumer Aftermath Report: How Identity Crimes Impact Victims, their Families, Friends, and Workplaces* (2021), https://www.idtheftcenter.org/wp-content/uploads/2021/09/ITRC_2021_Consumer_Aftermath_Report.pdf.
[19] *Id.*

56. The unauthorized disclosure of sensitive PII to data thieves also reduces its inherent value to its owner, which has been recognized by courts as an independent form of harm.[20]

57. Consumers are injured every time their data is stolen and traded on underground markets, even if they have been victims of previous data breaches. Indeed, the dark web comprises multiple discrete repositories of stolen information that can be aggregated together or accessed by different criminal actors who intend to use it for different fraudulent purposes. Each data breach increases the likelihood that a victim's personal information will be exposed to more individuals who are seeking to misuse it at the victim's expense.

58. As a result of the wide variety of injuries that can be traced to the Data Breach, Plaintiff and Class Members have and will continue to suffer economic loss and other actual harm for which they are entitled to damages, including, but not limited to, the following:

a. The unconsented disclosure of confidential information to a third party;

b. Unauthorized use of their PII without compensation;

c. Losing the value of the explicit and implicit promises of data security;

d. Losing the value of access to their PII permitted by Defendant without their permission;

e. Identity theft and fraud resulting from the theft of their PII;

f. Costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

g. Anxiety, emotional distress, and loss of privacy;

h. The present value of ongoing credit monitoring and identity theft protection

[20] *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—that the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

services necessitated by the Data Breach;

i. Unauthorized charges and loss of use of and access to their accounts;

j. Lowered credit scores resulting from credit inquiries following fraudulent activities;

k. Costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to mitigate and address the actual and future consequences of the Data Breach, including searching for fraudulent activity, imposing withdrawal and purchase limits on compromised accounts, and the stress, nuisance, and annoyance of dealing with the repercussions of the Data Breach; and

l. The continued, imminent, and certainly impending injury flowing from potential fraud and identity theft posed by their PII being in the possession of one or more unauthorized third parties.

59. Even in instances where an individual is reimbursed for a financial loss due to identity theft or fraud, that does not make that individual whole again as there is typically significant time and effort associated with seeking reimbursement. The Department of Justice's Bureau of Justice Statistics found that identity theft victims "reported spending an average of about 7 hours clearing up the issues" relating to identity theft or fraud.[21]

60. Plaintiff and Class Members place significant value in data security. According to a survey conducted by cyber-security company FireEye Mandiant, approximately 50% of consumers consider data security to be a main or important consideration when making purchasing decisions and nearly the same percentage would be willing to pay more to work with a provider that has better data security. Seventy percent of consumers would be less willing to provide personal information to organizations that have suffered a data breach.[22]

---

[21] E. Harrell, *Victims of Identity Theft, 2014*, U.S. DEPARTMENT OF JUSTICE (Nov. 13, 2017), http://www.bjs.gov/content/pub/pdf/vit14.pdf.

[22] Richard Turner, *Beyond the Bottom Line: The Real Cost of Data Breaches*, FIREEYE (May 11, 2016), https://web.archive.org/web/20210422161745/https://www.fireeye.com/blog/executive-perspective/2016/05/beyond_the_bottomli.html.

61. Plaintiff and Class Members have a direct interest in Defendant's promises and duties to protect PII, i.e., that Defendant would ***not increase*** their risk of identity theft and fraud. Because Defendant failed to live up to its promises and duties in this respect, Plaintiff and Class Members seek the present value of ongoing identity protection services to compensate them for the present harm and present and continuing increased risk of harm caused by Defendant's wrongful conduct. Through this remedy, Plaintiff seeks to restore herself and Class Members as close to the same position as they would have occupied but for Defendant's wrongful conduct, namely its failure to adequately protect Plaintiff's and the Class Members' PII.

62. Plaintiff and Class Members further seek to recover the value of the unauthorized access to their PII permitted through Defendant's wrongful conduct. This measure of damages is analogous to the remedies for the unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's PII is non-rivalrous—the unauthorized use by another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, a Plaintiff may generally recover the reasonable use of the value of the IP—i.e., a "reasonable royalty" from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as in the case of a non-practicing patentee) and even though the owner would not have otherwise licensed such IP to the infringer. A similar royalty or license measure of damages is appropriate here under common law damages principles, authorizing recovery of rental or use value. This measure is appropriate because: (a) Plaintiff and Class Members have a protectible property interest in their PII; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; (c) rental value is established with reference to market value, i.e., evidence regarding the value of similar transactions.

63. Plaintiff and Class Members have an interest in ensuring that their PII is secured and not subject to further theft, as Defendant continues to hold their PII.

### *5.* Plaintiff Beverly Tompkins's Experience and Injury

64. As a direct and proximate result of the Data Breach, Plaintiff has suffered concrete, particularized, and actual injuries-in-fact, including but not limited to the following:

a. Plaintiff has experienced a substantial increase in spam calls and spam emails since the Data Breach, which is consistent with the unauthorized access to and misuse of her contact information;

b. Plaintiff has spent time and effort responding to the Data Breach, including reviewing the breach notice, contacting her bank, monitoring her financial accounts and credit information for unauthorized activity, and researching the Data Breach and steps to protect herself—all of which constitute time and effort that Plaintiff would have otherwise devoted to work, recreation, or other activities;

c. Plaintiff faces a heightened and ongoing risk of targeted phishing, social engineering, and identity-related fraud as a result of the exposure of her name, contact information, demographic data, and transaction history—information that provides a threat actor with a detailed profile enabling highly targeted and convincing fraudulent communications;

d. Plaintiff has suffered a loss of privacy arising from the unauthorized access to and potential disclosure of her Personal Information to unauthorized third parties;

e. Plaintiff's Personal Information has diminished in value as a result of the Data Breach;

f. Plaintiff did not receive the full benefit of her bargain with Defendant, as she provided her Personal Information in exchange for services with the reasonable expectation that Defendant would maintain adequate security, which it failed to do; and

g. Plaintiff has suffered and will continue to suffer the costs and burdens of ongoing monitoring and mitigation necessitated by the Data Breach.

65. Plaintiff's injuries are concrete and particularized and are not merely speculative or hypothetical. The increased spam communications Plaintiff has experienced constitute a present,

tangible harm directly traceable to the unauthorized access to her contact information. The time and money Plaintiff has spent in mitigation efforts constitute out-of-pocket losses and lost time. The combination of Plaintiff's name, contact details, demographic data, and transaction history provides a comprehensive profile enabling targeted social engineering—a risk that is substantially elevated and reasonably impending given the nature and volume of the data exposed and the circumstances of the unauthorized access.

66. Plaintiff's injuries are fairly traceable to Defendant's failure to implement reasonable data security measures and are redressable by this Court through compensatory damages, injunctive relief, and other remedies. Plaintiff has standing to pursue her claims under Article III of the United States Constitution. *See*, *e.g.*, *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) (requiring "certainly impending" risk or substantial risk of future harm).

67. Plaintiff's increased risk of future harm is not speculative. The data at issue—contact information, demographic data, and transaction history—enables highly personalized phishing and social engineering attacks. Threat actors routinely exploit precisely this type of contextual information to craft convincing fraudulent communications. The risk is compounded by the large number of affected individuals (approximately 537,877), which increases the likelihood that threat actors will exploit the data for commercial fraud, targeted scams, or other identity-related schemes.

68. Plaintiff has no felony convictions, is not in bankruptcy, and has no conflicts of interest with the proposed class. Plaintiff is willing and able to serve as class representative in this action and to vigorously protect the interests of the class.

### *6.* Defendant's Delayed Notification

69. The timeline of Defendant's discovery and notification further exacerbated the harm to Plaintiff and Class Members. Defendant discovered the breach on approximately November 22, 2025, but did not report it to the Maine Attorney General until January 12, 2026—a delay of approximately 51 days. Consumer notifications began on or about January 16, 2026, approximately 55 days after discovery.

70. Plaintiff did not receive her notification until on or about February 16, 2026—approximately 87 days after Defendant's discovery. During this period, Plaintiff and Class Members were unaware that their Personal Information had been compromised and were unable to take mitigation steps to protect themselves.

71. This delay deprived Plaintiff and Class Members of the opportunity to take timely protective action, such as monitoring accounts, placing fraud alerts, or exercising heightened vigilance against phishing and social engineering attempts during the critical post-breach period.

## CLASS ACTION ALLEGATIONS

72. Plaintiff brings this action on behalf of herself and the following proposed nationwide class (herein "the Class"), defined as follows:

> All persons residing in the United States whose Personal Information was compromised in the data breach involving the April 2025 data snapshot, as disclosed by Defendant, including but not limited to all individuals who were sent a breach notification.

73. Excluded from the proposed Class are any officer or director of Defendant; any officer or director of any affiliate, parent, or subsidiary of Defendant; anyone employed by counsel in this action; and any judge to whom this case is assigned, his or her spouse, and members of the judge's staff.

74. **Numerosity:** The proposed Class consists of approximately 537,877 individuals, which is far too numerous for practical joinder. Membership in the Class is readily ascertainable

from Defendant's own records and breach notification lists.

75. **Commonality:** Common questions of law and fact exist as to the proposed Class Members and predominate over questions affecting only individual Class Members. These common questions include:

a. Whether Defendant owed a duty to Plaintiff and Class Members to exercise reasonable care in collecting, storing, and safeguarding their Personal Information;

b. Whether Defendant breached that duty by failing to implement and maintain reasonable data security measures;

c. Whether the Data Breach was caused by Defendant's inadequate security practices;

d. Whether Defendant's conduct was negligent, in breach of implied contract, or otherwise wrongful;

e. Whether Plaintiff and Class Members suffered damages and are entitled to relief as a result of the Data Breach;

f. Whether Plaintiff and Class Members are at an increased risk of phishing, social engineering, and identity-related fraud; and

g. Whether Plaintiff and Class Members are entitled to equitable relief, including injunctive and declaratory relief.

76. Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, individually, and on behalf of the other Class Members. Similar or identical statutory and common violations, business practices, and injuries are involved. Individual questions, if any, pale in comparison, both in quantity and quality, to the numerous questions that dominate this action.

77. **Typicality:** Plaintiff's claims are typical of the claims of the Members of the Class. All Class Members were subject to the Data Breach and had their PII accessed by and/or disclosed to unauthorized third parties. Defendant's misconduct affected all Class Members in the same

manner.

78. **Adequacy of Representation:** Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the other Class Members she seeks to represent; she has retained counsel competent and experienced in complex class action litigation, and Plaintiff will prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and her counsel.

79. **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this matter as a class action. The damages, harm, or other financial detriment suffered individually by Plaintiff and the other Class Members are relatively small compared to the burden and expense that would be required to litigate their claims on an individual basis against Defendant, making it impracticable for Class Members to individually seek redress for Defendant's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation would create a potential for inconsistent or contradictory judgments, increasing the delay and expense for all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

80. Plaintiff's counsel seek appointment as interim class counsel pursuant to Federal Rule of Civil Procedure 23(g). Plaintiff's counsel have substantial experience in data breach class actions and complex litigation, have committed significant resources to investigating and prosecuting this action, and are well qualified to represent the interests of the Class.

## **CAUSES OF ACTION**

**COUNT I**
**NEGLIGENCE**
**(On Behalf of Plaintiff and the Nationwide Class)**

81. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

82. Defendant owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, and protecting their Personal Information from unauthorized access, disclosure, and misuse. This duty arose from Defendant's collection and storage of Personal Information in the course of its business operations, and from the foreseeable risk that inadequate security would result in unauthorized access.

83. Defendant's duty included, among other things: (a) designing, implementing, and maintaining reasonable data security systems; (b) properly configuring and securing systems containing Personal Information; (c) implementing encryption at rest for stored data; (d) establishing appropriate access controls; (e) monitoring for unauthorized access; and (f) timely detecting and responding to security incidents.

84. Defendant breached its duty by failing to exercise reasonable care to safeguard and protect Plaintiff's and Class Members' Personal Information. It was reasonably foreseeable that Defendant's failure to implement adequate security measures would result in unauthorized access to Personal Information stored on its systems.

85. But for Defendant's wrongful and negligent breach of its duties, the Data Breach would not have occurred and Plaintiff's and Class Members' Personal Information would not have been compromised.

86. Neither Plaintiff nor any Class Member contributed to the Data Breach.

87. As a direct and proximate result of Defendant's negligence, Plaintiff and Class

Members have suffered injuries including, but not limited to: (i) increased and unwanted spam calls and emails; (ii) a substantially increased and ongoing risk of targeted phishing, social engineering, and identity-related fraud; (iii) loss of privacy; (iv) the time, effort, and out-of-pocket costs of monitoring and mitigation; (v) the diminished value of their Personal Information; (vi) the loss of the benefit of their bargain with Defendant; and (vii) the present value of ongoing monitoring necessitated by the Data Breach.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and the Nationwide Class)**

88. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

89. When Plaintiff and Class Members provided their Personal Information to Defendant in connection with their use of the ANKA platform, they did so with the reasonable expectation and mutual understanding that Defendant would use their Personal Information only for legitimate business purposes and would implement and maintain reasonable security measures to safeguard their Personal Information from unauthorized access and disclosure.

90. Defendant accepted and retained Plaintiff's and Class Members' Personal Information and, in doing so, accepted the obligations flowing from the exchange of data for services. The circumstances surrounding the parties' interactions—including Defendant's solicitation and collection of Personal Information as a condition of platform access—created an implied contract pursuant to which Defendant agreed to reasonably safeguard and protect such information.

91. The implied contract included, but was not limited to, Defendant's obligations to: (a) use the Personal Information only for legitimate business purposes; (b) implement and maintain reasonable data security measures consistent with applicable laws, regulations, and industry

standards; and (c) promptly provide accurate and complete notice in the event of a security incident.

92. Defendant materially breached the implied contract by failing to implement and maintain reasonable data security measures and by failing to prevent, detect, or timely contain the Data Breach.

93. As a direct and proximate result of Defendant's breach, Plaintiff and Class Members have suffered damages including, but not limited to: (i) the loss of the benefit of their bargain; (ii) the diminished value of the services received, because part of the value conferred was for reasonable data security that Plaintiff and Class Members did not receive; (iii) the exposure of their Personal Information; (iv) the increased risk of phishing, social engineering, and identity-related fraud; (v) out-of-pocket costs of mitigation; and (vi) ongoing monitoring costs.

**COUNT III**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Nationwide Class, in the Alternative)**

94. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

95. Plaintiff and Class Members conferred a benefit upon Defendant by providing their Personal Information in connection with the ANKA platform. Defendant derived substantial commercial benefit from the collection, use, and maintenance of Plaintiff's and Class Members' Personal Information, including by using that data to facilitate its e-commerce operations, improve its platform, and support its business.

96. Defendant accepted and retained the benefits conferred by Plaintiff and Class Members with knowledge that Plaintiff and Class Members expected their Personal Information to be reasonably protected.

97. Defendant failed to implement reasonable security measures to protect Plaintiff's and Class Members' Personal Information, rendering the benefit conferred inequitable to retain. Defendant should not be permitted to retain the benefit of Plaintiff's and Class Members' Personal Information without adequate security.

98. It would be inequitable and unjust for Defendant to retain the benefits it received from Plaintiff and Class Members without providing adequate data security in return. Plaintiff and Class Members are entitled to restitution and/or disgorgement of Defendant's unjust enrichment.

**COUNT IV**
**DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**
**(On Behalf of Plaintiff and the Nationwide Class)**

99. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

100. An actual controversy exists between Plaintiff and Class Members, on the one hand, and Defendant, on the other, concerning their respective rights and duties with respect to the protection of Class Members' Personal Information and the adequacy of Defendant's data security practices.

101. Pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57, Plaintiff seeks a declaratory judgment that Defendant's data security practices, as alleged herein, were inadequate and unreasonable, and that Defendant owes a duty to implement and maintain reasonable security measures to protect the Personal Information of Plaintiff and Class Members.

102. Plaintiff and Class Members have suffered irreparable harm as a result of the Data Breach, including the ongoing risk of phishing, social engineering, and identity-related fraud, which cannot be fully remedied by monetary damages alone. Class Members' Personal Information remains in Defendant's possession, and absent injunctive relief, there is a continuing

risk of further harm.

103. Plaintiff, individually and on behalf of the Class, seeks injunctive relief requiring Defendant to implement and maintain reasonable data security practices, including but not limited to:

a. Engaging independent, qualified third-party security auditors to conduct comprehensive audits of Defendant's data security practices on a regular basis and to provide reports to the Court or a court-appointed monitor;

b. Implementing and maintaining encryption at rest for all stored Personal Information;

c. Implementing and maintaining least-privilege access controls governing access to systems containing Personal Information;

d. Implementing and maintaining appropriate cloud configuration management controls, including regular review and hardening of system configurations;

e. Implementing and maintaining comprehensive logging and monitoring for unauthorized access to systems containing Personal Information;

f. Implementing and maintaining a reasonable data retention and minimization policy, under which Personal Information that is no longer necessary for a legitimate business purpose is securely deleted;

g. Implementing and maintaining reasonable incident response and breach notification procedures to ensure timely detection, containment, and disclosure of security incidents; and

h. Implementing and maintaining reasonable security awareness training for all employees and contractors with access to systems containing Personal Information.

104. The balance of equities favors injunctive relief, as the harm to Plaintiff and Class Members from continued inadequate security far outweighs any burden to Defendant of implementing reasonable, industry-standard practices. Injunctive relief is in the public interest because it would protect hundreds of thousands of individuals whose Personal Information remains in Defendant's custody.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the other members of the Class proposed in this Complaint, respectfully request that the Court enter judgment in their favor and against Defendant, as follows:

(a) Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiff as Class Representative, and appointing Plaintiff's counsel as Lead Counsel for the Class;

(b) A declaratory judgment that Defendant's data security practices were inadequate and unreasonable, and that Defendant has a continuing duty to implement and maintain reasonable data security measures;

(c) Injunctive relief as described herein, requiring Defendant to implement and maintain reasonable data security practices;

(d) An award of compensatory damages, including actual damages for time spent, mitigation costs, and other out-of-pocket losses;

(e) An award of statutory damages where applicable;

(f) Restitution and/or disgorgement of Defendant's unjust enrichment;

(g) Nominal damages where applicable;

(h) Pre-judgment and post-judgment interest at the maximum rate allowable by law;

(i) An award of reasonable attorneys' fees, costs, and expenses; and

(j) Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all appropriate issues raised in this Class Action Complaint.

Dated: February 24, 2026

Respectfully submitted,

*/s/ Martha A. Geer*
Martha A. Geer (NY Reg. No. 1917129)
**BRYSON HARRIS SUCIU & DeMAY PLLC**

900 W. Morgan Street
Raleigh, NC 27603
Telephone: (206) 623-7292
Email: mgeer@brysonpllc.com

and

J. Hunter Bryson (NC Bar No. 123599)*
**BRYSON HARRIS SUCIU & DeMAY PLLC**
11 Park Place, 3rd Floor
New York, NY 10007
Telephone: 919-539-2708
hbryson@brysonpllc.com

*Application for pro hac vice forthcoming

*Attorneys for Plaintiff*